## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

Benita M. Woollard                          :        Case No. 5:14CV206

      Plaintiff,                              :

vs.                                         :

Commissioner of Social Security Administration, :    **REPORT AND**
                                                     **RECOMMENDATION**

      Defendant.                             :

                                            :

This case was referred to the undersigned Magistrate pursuant to Local Rule 3.1, and 28 U.S.C. § 636, for the preparation of a Report and Recommendation.  Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the Commissioner's final decision denying her application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 416(i) and 423.  Pending are briefs on the merits filed by both parties (Docket Nos. 13 & 16), and Plaintiff's Reply (Docket No. 17).  For the reasons set forth below, the Magistrate recommends that the Court affirm the decision of the Commissioner.

## I. PROCEDURAL BACKGROUND

On April 9, 2010, Plaintiff  filed an application for DIB, alleging disability beginning March 4, 2009 (Docket No 12, pp 124-125 of 764).  Plaintiff's claim was denied on September 18, 2010, and upon reconsideration on March 2, 2011 (Docket No. 12, pp. 87-90; 96-98 of 764).  Plaintiff filed a written request for a hearing on March 16, 2011 (Docket No. 12, p. 103 of 764).  On April 26, 2012, Administrative Law Judge (ALJ) Robert C. King

presided over the hearing in Akron, Ohio, at which Plaintiff, represented by counsel Michael Malyuk, and Vocational Expert (VE) Mark Anderson, appeared and testified (Docket No. 12, p. 38 of 764). The ALJ issued an unfavorable decision on August 29, 2012 (Docket No.12, pp. 18-32 of 764). The Appeals Council denied review of the ALJ's decision on December 4, 2013, thus rendering the ALJ's decision the final decision of the Commissioner (Docket No. 12, p. 5 of 764).

## II. FACTUAL BACKGROUND

A.    ADMINISTRATIVE HEARING

   1.    PLAINTIFF'S TESTIMONY

Plaintiff testified that she was 50 years old, five feet tall and weighs one hundred twenty three pounds. She completed her GED and attends college classes part-time in pursuit of her bachelor's degree (Docket No. 12, pp. 41; 46 of 764). Plaintiff described her past work as a residential appraiser from 1997 until 2008 (Docket No. 12, p. 42 of 764). Plaintiff testified that she drives, lives in a ranch style home and that her adult daughter and three grandchildren, ages eleven, five, and one, all live with her (Docket No. 12, pp. 44-45 of 764). According to Plaintiff, her typical day includes making herself something to eat, studying, and meeting a friend for lunch (Docket No. 12, pp. 45-46 of 764). Plaintiff testified that she is able to dress, bathe, and clothe herself. She is also capable of performing some household chores including dusting, vacuuming, and doing the laundry, but she is unable to mop or take out the trash. She could, however, mow the lawn using a riding mower (Docket No. 12, pp. 47-48 of 764). Plaintiff noted that she uses the computer from two to three hours a day and that she reads daily for approximately one hour (Docket No. 12, pp. 51-52 of 764). Plaintiff also testified that she talks with friends on the phone for approximately 30 minutes to an hour or more daily (Docket No. 12, p. 49 of 764).

With respect to her social activities, Plaintiff testified that she visits friends and that they also come to see her a couple of times a month (Docket No. 12, p. 48 of 764). Plaintiff estimates that she drives five of seven days a week, including trips to school at least twice a week (Docket No. 12, pp. 46, 51 of 764). Plaintiff also grocery

shops, eats in restaurants four or more times a month, and occasionally goes to the movies (Docket No. 12, pp. 49-50 of 764).  In 2009, Plaintiff traveled by airplane to Phoenix, Arizona and to Hawaii in 2010 to visit family.  Most recently, she flew to Las Vegas, Nevada (Docket No. 12, pp. 52-53 of 764).  Plaintiff explained that she was able to go to Phoenix, Las Vegas, and Hawaii because during the flight, she was able to walk around the airplane (Docket No. 12, p. 64 of 764).

In response to questioning, Plaintiff identified the pain that she feels from her neck to her extremities, arms and shoulders as the  most significant problems.  She described being in constant pain, the intensity of which she rated at a six out of ten when stationary, which can intensify to a 9.5 out of ten (Docket No. 12, p. 54 of 764).  Plaintiff stated that she does not take pain medication because it does not work, but that she does  take Xanax for anxiety at night (Docket No. 12, pp. 55-56 of 764).  Plaintiff testified that her primary care physician is Dr. Kevin Mineo, and he  has treated her continuously since 2007.  Plaintiff testified that her lack of mobility contributes to her being unable to work (Docket No. 12, pp. 55; 65 of 764).  Plaintiff noted that she is unable to sit or stand for long periods of time, explaining that it is uncomfortable to sit for even 10 to 15 minutes and that after an hour of sitting she feels really bad and has to stand.  Plaintiff explained that she used to be very active, but since having been diagnosed with Fibromyalgia, her life has changed (Docket No. 12, p. 57 of 764).

During direct examination by Plaintiff's attorney, Plaintiff testified that she also has difficulties with episodes of bowel obstruction which limit her ability to work (Docket No. 12, p. 57 of 764).  According to Plaintiff, the bowel obstructions occur out of the blue, consist of sudden pain on her left side, which causes her to vomit uncontrollably and results in hospitalization.  Over the last year, Plaintiff has had episodes of bowel obstruction once or twice (Docket No. 12, p. 58 of 764).  The last time Plaintiff experienced a bowel obstruction, she recalled being in the hospital for five days (Docket No. 12, p. 58 of 764).  Plaintiff also indicated she has plantar keratosis on the bottom of her foot that affects her walking and causes pain, as often as a couple times a week (Docket No. 12, p. 59 of 764).  Plaintiff explained that this condition affected her while employed in her appraisal job (Docket

No. 12, p. 60 of 764).  Plaintiff also has mixed hearing loss with more extensive hearing loss in her right ear and

tinnitus (Docket No. 12, p. 60 of 764).  Plaintiff indicated that her doctors are considering a hearing aid for her left

ear and that she was scheduled to undergo surgery on her right ear on May 25th (Docket No. 12, p. 60 of 764).

Plaintiff also testified that she has fibromyalgia and back problems, which resulted in a cervical fusion  in

2009 (Docket No. 12, pp. 60-61 of 764).  Plaintiff stated that her fibromyalgia condition has gotten worse with her

physical  and emotional stress (Docket No. 12, p. 65 of 764).  Plaintiff noted that she has bad days as frequently

as once a week when she does not leave the house and consequently misses class (Docket No. 12, pp. 65-66 of 764).

Her fibromyalgia causes her arms and legs to feel heavy,  prickly and painful (Docket No. 12, p. 66 of 764).

Plaintiff opined that she did not think she could perform a simple job for eight hours a day, five days a week

because she has to limit herself to get through life.  She did not think that she could perform such work without

ending up in the hospital and receiving a lot of drugs (Docket No. 12, p. 67 of 764).  When asked by the ALJ how

someone with her condition could ride on the back of a motorcycle as detailed in one of her medical records,

Plaintiff responded that she thought she would do something that "sounded like fun," but that it was "a poor choice"

(Docket No. 12, pp. 68-69 of 764).

## 2.    VE TESTIMONY

The VE defined Plaintiff's prior work as an appraiser, DOT[1] 188.167-010, light exertion, skilled, with a

specific vocational preparation (SVP)[2] of 7, performed at light exertion, using foot pedals like a chauffeur, and not

lifting more than 20 pounds (Docket No. 12, p. 72 of 764).

After asking the VE to consider a hypothetical individual of the same age, education, and past work

---

[1]  Dictionary of Occupational Titles ("DOT")

[2]  SVP is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. www.onetonlne.org.  SVP is a component of Worker Characteristics information found in the Dictionary of Occupational Titles (DOT), a publication that provides universal classifications of occupational definitions and how the occupations are performed.  www.occupationalinfo.org.

experience as Plaintiff, the ALJ presented his first of six hypothetical questions to the VE:

[A]ssume that the individual can lift and/or carry 20 pounds occasionally and 10 pounds frequently. She can stand and/or walk with normal breaks for about six hours in an eight-hour workday. She can sit with normal breaks for about six hours in an eight-hour workday. She has no limitations in her ability to push and/or pull including the operations of hand and/or foot controls other than is limited by her restrictions on lifting and/or carrying. She can occasionally climb ramps and stairs; she can never climb ladders, ropes or scaffolds. She can occasionally stoop, kneel, crouch and crawl. She can frequently reach in all directions except that she can only occasionally reach overhead bilaterally. She needs to avoid concentrated exposure to respiratory irritants such as fumes, odors, dusts, gasses, poor ventilation, et cetera. She has some bilateral hearing loss and cannot hear well at <u>DOT</u> noise levels four and five however she can hear and understand a normal conversation at <u>DOT</u> noise levels one, two and three. . . . She cannot work in an environment with high quotas, strict time limits or deadlines or fast-paced production demands such as those encountered in piecework or on a fast moving assembly line. Based on hypothetical number one, could she perform her past work as a residential appraiser?

(Docket No. 12, pp. 73-75 of 764). After considering these limitations, the VE testified that Plaintiff's past work would be available to her both as actually performed and generally required by employers in the national economy (Docket No. 12, p. 75 of 764). The VE also indicated that the skills required for work as a residential appraiser are specific to that occupation and not generally transferable to other occupations. The VE provided other unskilled jobs that an individual of the same vocational profile and residual functional capacity could perform including cashier, DOT 211.462-010, light exertion, unskilled, having 2,900,000 jobs in the national economy, 113,000 in the State of Ohio, and 20,000 in northeast Ohio; mail clerk, DOT 209.687-026, light exertion, unskilled, having 195,000 jobs in the nation, 9,500 in the State of Ohio, and 3,500 in northeast Ohio; electronics worker, DOT 726.687-010, light exertion, unskilled, with 240,000 jobs in the nation, 13,000 in the State of Ohio, and 3,500 in northeast Ohio (Docket No. 12, p. 75 of 764).

The ALJ then posed his second hypothetical question:

It's the same in all respects as hypothetical number one but in addition she needs to be able to alternate between sitting and standing every 30 minutes with five minutes in the alternative position at the work station before resuming the original position of sitting or standing. Based on hypothetical number two, could she still do the past work as a residential appraiser?

(Docket No. 12, pp. 75-76 of 764). In response, the VE testified that Plaintiff could perform her past work, both

actually and as generally performed, opining that an individual in the residential appraiser position sets their own pace and would need to get out of the car after 30 minutes, could stand or alternate positions, and that while at a residence there would generally be a place to sit down to complete paperwork (Docket No. 12, p. 76 of 764).  When asked whether there was any other unskilled work that the Plaintiff could perform, the VE responded that the electronics worker and mail sorter positions can be performed while sitting or standing, but that he would replace the cashier position with the job of an inspector and hand packager, DOT 559.687-074, light exertion, unskilled, having 235,000 jobs in the nation, 22,500 in the State of Ohio, and 4,500 in northeast Ohio (Docket No. 12, p. 76 of 764).

In his third hypothetical question, the ALJ noted:

[I]t's the same in all respects as hypothetical number one except that she can lift and/or carry 10 pounds occasionally and less than 10 pounds frequently and she can stand and/or walk with normal breaks for at least two hours in an eight-hour workday.  So based on hypothetical number three, I take it she could not do her past work?

(Docket No. 12, p. 77 of 764).  The VE testified that under such a hypothetical, Plaintiff would be unable to perform her past work.  When asked if there were any other unskilled jobs such an individual could perform, the VE gave examples including document preparer, DOT 249.587-018, sedentary, unskilled, having 180,000 jobs in the nation, 19,000 in the State of Ohio, and 4,000 in northeast Ohio; inspector of wooden products, DOT 669.687-014, sedentary, unskilled, having 120,000 jobs in the nation, 11,000 in the State of Ohio, and 4,500 in northeast Ohio; credit information clerk, DOT 237.367-014, sedentary, unskilled, having 88,000 jobs in the nation, 10,500 in the State of Ohio, and 2,500 in northeast Ohio (Docket No. 12, p. 77 of 764).  The VE testified that Plaintiff did not acquire transferable skills for work within this residual functional capacity (Docket No. 12, p. 77 of 764).

The ALJ then asked his fourth hypothetical question:

It's the same in all respects as hypothetical number three with the additional restriction that she needs to be able to alternate between sitting and standing every 30 minutes with five minutes in the alternative position at the work station before resuming the original position of sitting or standing. So no past work as the residential appraiser, are there any unskilled jobs an individual with that

6

vocational profile and residential functional capacity could perform?

(Docket No. 12, pp. 77-78 of 764).  After considering the ALJ's fourth hypothetical, the VE responded that the jobs of document preparer, inspector of wooden products, and credit information clerk jobs would qualify since they all can be done either sitting or standing (Docket No. 12, p. 78 of 764).  In hypothetical question number five, the ALJ asked: "What is the effect of an individual being off task 20 percent of the workday?" (Docket No. 12, p. 78 of 764). The VE responded that generally, someone being off task 20 percent of the workday is not considered competitively employable (Docket No. 12, pp. 78-79 of 764).

In the ALJ's final hypothetical, he asked about someone who misses three days of work a month (Docket No. 12, p. 79 of 764).  The VE responded that according to the latest research from 2007, generally missing three days of work per month would not deem the person competitively employable (Docket No. 12, pp. 79-80 of 764). The VE testified that his testimony was consistent with the information found in the DOT, its companion publication, SELECTED CHARACTERISTICS OF OCCUPATIONS, supplemented by his training, education, experience and knowledge of the labor market, and in consultation with his colleagues (Docket No. 12, pp. 79-80 of 764).

On direct examination by Plaintiff's lawyer, he asked the VE to consider Plaintiff's periodic limb movement disorder of sleep in his hypothetical questions and added limitations during the day for sustainability (Docket No. 12, p. 80 of 764).  Plaintiff's counsel then asked the VE to revisit hypothetical questions one, two, three and four, before asking whether Plaintiff's past work would be eliminated if the hypothetical claimant were further limited to no repetitive work on a continuous basis (Docket No. 12, p. 81 of 764).  After considering the limitation, the VE testified that the past jobs would not be eliminated since the only temperament the appraisal job carries is for judgment and that it does not carry the R temperament (Docket No. 12, p. 81 of 764).

In response to additional follow-up questions from counsel, the VE indicated that in order for the hypothetical claimant to be employable she must work for eight hours and that being off task more than 15 percent would also make a hypothetical claimant unemployable (Docket No. 12, p. 81 of 764).  Next, Counsel asked

whether frequent reaching in all directions was important to Plaintiff's past work. The VE indicated that the appraiser position rates reaching as frequent and that limiting hypothetical number one to occasional reaching would eliminate Plaintiff's past work and all of the unskilled jobs previously listed because they all require reaching (Docket No. 12, p. 82 of 764). Counsel next inquired as to whether a sit/stand option at will rather than in 30 minute intervals would affect any of the VE's responses to any of the hypothetical questions (Docket No. 12, pp. 82-83 of 764). The VE responded that the residential appraiser would have the ability to stop and get out of the car to stretch more frequently and that the other jobs described would allow sitting or standing at will at the work station (Docket No. 12, p. 83 of 764). Finally, Counsel asked whether the hypothetical claimant, if she could not use her feet for repetitive moments such as in operating foot controls, at least on her left extremity, would be prevented from performing her past work. The VE responded that unless operating a stick shift, the hypothetical claimant could drive a vehicle with one extremity (Docket No. 12, p. 83 of 764).

## B.   MEDICAL RECORDS

Summaries of Plaintiff's medical records, to the extent they are necessary and relevant to the issues before this Court, follow.

### 1.   OFFICE TREATMENT RECORDS - CLEVELAND CLINIC SLEEP DISORDERS CENTER

- On February 25, 2005, Plaintiff underwent a sleep study and was diagnosed by Dr. Joseph Colish, MD, with primary snoring, frequent periodic leg movements during sleep, abnormal sleep architecture due to periodic leg movements and first night effect (Docket No. 12, pp. 274-275 of 764).

### 2.   OFFICE TREATMENT RECORDS - AKRON ENT ASSOCIATES

- On November 6, 2006, Plaintiff was evaluated for symptoms related to her upper airway and left ear. Plaintiff reported intermittent tinnitus in both ears with more intense pressure in her left ear. After examination, Dr. Kenneth E. Mooney, MD, DMD, diagnosed Plaintiff with nasal septal deviation, turbinate hypertrophy, fibromyalgia and sensorineural hearing loss. Dr. Mooney recommended a CT scan at that time (Docket No. 12, pp. 696-702 of 764).

- On October 14, 2011, Plaintiff was seen for difficulties with hearing and was diagnosed with mixed hearing loss, new onset in her right ear, tinnitus, and fibromyalgia. Dr. Mooney recommended

Plaintiff undergo a CT scan of the temporal bone to determine whether there was any middle ear process (Docket No. 12, pp. 689-695 of 764).

- On November 7, 2011, Plaintiff had a follow-up with Dr. Mooney, following a CT scan of her temporal bone, which did not reveal any evidence for mastoid or middle ear disease. Dr. Mooney diagnosed Plaintiff with mixed hearing loss in her right year, sensorineural hearing loss in her left ear and a history of vertigo. Plaintiff's treatment options included amplifications, no intervention, or middle ear exploration with possible ossicular reconstruction (Docket No. 12, pp. 685; 687-688 of 764).

- On December 15, 2011, Plaintiff presented complaining of ringing in her right ear. After an examination, Dr. Cliff A. Megerian, MD, FACS, opined that it was possible that Plaintiff had some ossicular discontinuity, ossicular fixation such as otosclerosis. Plaintiff's treatment options included hearing aids or surgery and Plaintiff opted for a referral to Dr. Mooney for a hearing aid (Docket No. 12, p. 683 of 764).

3. **MEDICAL TESTING RECORD - AKRON GENERAL MEDICAL CENTER**

- On December 17, 2008, Plaintiff underwent a Stress-Rest Myocardial Perfusion Scan. The impression reflects that there was no definite evidence for myocardial ischemia, suspicions for mycardial scar of the proximal inferolateral wall, and regional wall motion was abnormally correlating to the area of scar with an overall left ventricular ejection fraction of 65% (Docket No. 12, p. 263 of 764). A nuclear stress test performed the same day was normal (Docket No. 12, pp. 264-265 of 764).

- On May 27, 2011, Plaintiff presented complaining of abdominal pain. On examination she was described appearing acutely uncomfortable and that she was tachycardic, mildly hypertensive and febrile. Plaintiff was treated with Zofran,[3] Dilaudid,[4] and Phenergan.[5] Dr. Mary Jo McMullen, MD, diagnosed Plaintiff with abdominal pain, history of small bowel obstruction, leukocytosis, and anxiety. A CT scan revealed marginally dilated single loop of small bowel in the right lower quadrant, but that there was otherwise no convincing evidence of bowel obstruction (Docket No. 12, pp. 558-574; 677-678 of 764).

---

[3]Zofran is a medication prescribed to prevent nausea and vomiting after surgery. *Zofran oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD (Sept. 8, 2014, 9:11 AM), http://www.webmd.com/drugs/2/drug-30/zofran-oral/details.

[4] Dilaudid is prescribed to help relieve moderate to severe pain. *Dilaudid oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD (Sept. 8, 2014, 9:13 AM), http://www.webmd.com/drugs/2/drug-9130/dilaudid- oral/details.

[5] Phenergan is prescribed to prevent nausea and vomiting related to certain conditions and may be used in conjunction with pain relievers to help their effectiveness. *Phenergan oral:Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD (Sept. 8, 2014, 9:16 AM), http://www.webmd.com/drugs/2/drug-6606/phenergan-oral/details.

9

4.    OFFICE TREATMENT RECORDS - PRIMARY CARE ASSOCIATES OF NORTHEAST OHIO, INC.

●    On February 5, 2009, presented as a new patient with Dr. Kevin C. Mineo MD, and complained that she did not feel well.  Plaintiff was diagnosed with upper respiratory infection (URI) and referred to Dr. Scott (Docket No. 12, p. 257 of 764).

●    On April 3, 2009, Plaintiff complained of left arm numbness down into her fingertips after recently engaging in heavy lifting.  On examination, focal deficits were noted in her left upper extremity and no improvements with off loading of her neck.  Dr. Mineo diagnosed Plaintiff with cervical radiculopathy, prescribed a Medrol[6] course and recommended physical therapy (Docket No. 12, p. 259 of 764).

●    On April 27, 2009, Plaintiff presented to Dr. Michael J. Shanafelt, DO, MS, for a follow-up examination after Plaintiff had visited the emergency room for cervical radiculopathy, neck and shoulder pain.  Plaintiff reported that she had not taken the Naprosyn[7] provided to her and that the Medrol Dosepak provided minimal relief.  Plaintiff complained that she continued to have radiating pain from her neck down into her left arm and hand with some numbness.  On examination, Plaintiff had moderate pain, a very sensitive left trap, and her strength was noted as diminished due to pain.  Plaintiff's diagnosis remained unchanged, she was prescribed a Medrol Dospack and Percocet[8] for pain (Docket No. 12, p. 258 of 764).

●    On May 21, 2009, Plaintiff had a postoperative followup after undergoing cervical spine surgery with Dr. Brower.  She complained of a headache and atypical chest pain.  On examination, Plaintiff's anterior neck incision was described as healing very well without signs of drainage or tenderness and her heart was normal.  Dr. Mineo's primary diagnosis for Plaintiff was atypical chest pain and he opined that Plaintiff may have an underlying anxiety component.  Dr. Mineo's secondary diagnosis was cervical disc herniation status post surgery and he advised Plaintiff to take Tylenol for pain (Docket No. 12, p. 259 of 764).

●    On June 30, 2009, Plaintiff complained of symptoms unrelated to any of her disability claims.  Dr. Mineo reported that she  was recovering nicely from her cervical spine surgery and that she had just started some physical therapy.  On examination, Plaintiff had limited range of motion to her neck

---

[6]Medrol is prescribed to treat certain conditions including arthritis, blood disorders, severe allergic reactions, certain cancers, eye conditions, skin, kidney, intestinal, and lung diseases and immune system disorders. *Medrol oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD (Sept. 8, 2014, 9:18 AM), http://www.webmd.com/drugs/2/drug-6469/medrol-oral/details.

[7]Naproxen is prescribed to relieve pain from conditions including headaches, muscle aches, tendonitis, dental pain and menstrual cramps. Naproxen also can be used to reduce pain, swelling and joint stiffness caused by arthritis, bursitis, and gout. *Naproxyn oral*: *Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD (Sept. 8, 2014, 9:20 AM), http://www.webmd.com/drugs/2/drug-1705-1289/naprosyn-oral/naproxen-oral/details.

[8] Percocet is prescribed to help relieve moderate to severe pain. *Percocet oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD (Sept. 8, 2014, 9:24 AM), http://www.webmd.com/drugs/2/drug-7277/percocet- oral/details.

(Docket No. 12, p. 259 of 764).

- On September 8, 2009, Plaintiff complained of fibromyalgia pain and other "worsening" symptoms. On examination, Dr. Mineo described Plaintiff's mood as somewhat flat, but stable and he noted that her cervical spine range of motion had improved.  He diagnosed Plaintiff with fibromyalgia with suspected anxiety and depression.  He gave her a sample pack of Savella,[9] encouraged her to see a psychologist, and prescribed Vicodin[10] for pain (Docket No. 12, p. 260 of 764).

- On September 22, 2009, Plaintiff presented  for a follow-up for fibromyalgia and an adenoma.[11]  On examination, Plaintiff was described as mildly anxious.  Dr. Mineo recommended that Plaintiff take Savella and noted that Plaintiff's adenoma was most likely benign. He referred her to an endocrinologist for further evaluation noting  that she has a history of adrenal gland tumor (Docket No. 12, p. 261 of 764).

- On December 3, 2009, Plaintiff was seen for symptoms of URI.  On examination, Dr. Mineo described Plaintiff as having lots of redness and swelling to her eyes, but reported that she seemed to be improving.  Dr. Mineo noted that Plaintiff's fibromyalgia symptoms were under control since she started exercising more frequently.  Plaintiff was diagnosed with URI with mild conjunctivitis (Docket No.12, p. 261 of 764).

- On March 4, 2010, presented  after being seen by paramedics earlier in the morning when she reported having progressively worse palpitations.  On examination, Plaintiff's heart and lungs were described as normal and Dr. Mineo diagnosed Plaintiff with panic attack with generalized anxiety disorder, fibromyalgia, URI, and atypical chest pain.  She was prescribed Ativan[12] for her panic attacks (Docket No. 12, p. 262 of 764).

- On May 27, 2010, Plaintiff complained of difficulties sleeping and shortness of breath.  On examination, Plaintiff's heart and lungs were normal.  Dr. Mineo diagnosed Plaintiff with Period Limb Movement Disorder (PLMD) based on her reported history, and he requested a copy of her previous sleep study and opined that there may be an anxiety component to her sleep difficulties. He again prescribed Ativan (Docket No. 12, p. 262 of 764).

---

[9]Savella is prescribed to help manage fibromyalgia symptoms in adults. *Savella to Treat Fibromyalgia: Benefits & Side Effects*, WEBMD, (Sept. 8, 2014, 9:27 AM), http://www.webmd.com/fibromyalgia/guide/savella-for-fibromyalgia-treatment.

[10] Vicodin is prescribed to relieve moderate to severe pain. *Vicodin oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD (Sept. 8, 2014, 9:28 AM), http://www.webmd.com/drugs/2/drug-3459/vicodin- oral/details.

[11] An adenoma is a benign tumor of a gladular structure or of glandular origin. WEBSTER'S NEW EXPLORER MEDICAL DICTIONARY 12 (Merriam-Webster, New ed. 2006).

[12] Ativan is prescribed to treat anxiety. *Ativan oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD (Sept. 8, 2014, 9:36 AM), http://www.webmd.com/drugs/2/drug-6685/ativan-oral/details.

11

- On June 14, 2010, Plaintiff had a follow-up visit after being admitted to an Arizona hospital  for a small bowel episode.  Plaintiff had developed cellulitis and phlebitis to her left arm from an IV.  Plaintiff reported that her fibromyalgia pains had increased slightly, that  her blood pressure in the hospital was elevated and  that she was not compliant with medication recommendations.  Plaintiff complained  of increased anxiety, suffering persistent sore throat and nasal congestion.  On examination, Plaintiff's left forearm had some tenderness, no erythema or pus near the distal IV insertion site, her mood was stable and appropriate.  Plaintiff was advised to continue with Keflex[13] and Dr. Mineo noted they would continue to follow her blood pressure  (Docket No. 12, p. 646 of 764).

- On June 22, 2010, Plaintiff presented  for a follow-up after an ER visit for increased abdominal pain and nausea.  Plaintiff reported feeling the onset of an episode of bowel obstruction.  Although  she had not been compliant with taking her Reglan[14] medication, she felt better that day.  Dr. Mineo indicated Plaintiff's fibromyalgia was increased, her PLMD seemed to be worsening and causing her problems with insomnia. On examination, Plaintiff's blood pressure was elevated, but stable, and her abdomen had slight tenderness.  Dr. Mineo recommended Plaintiff try either over-the-counter medications Prilosec or Pepcid AC for her abdominal pain, prescribed  trazodone[15] for her insomnia and anxiety, and indicated they would monitor her blood pressure (Docket No. 12, p. 646 of 764).

- On July 22, 2010, Plaintiff complained of ongoing abdominal pain, weight loss, changing stools, fatigue, and episodes of apnea.  On examination Plaintiff's abdomen was described as soft and benign.  Dr. Mineo referred Plaintiff for a colonoscopy and to have her sleep study rechecked with respect to her apnea with PLMD and fibromyalgia (Docket No. 12, p. 647 of 764).

- On August 30, 2010, Plaintiff visited Dr. Mineo to review her sleep study results. Plaintiff had not started her Mirapex[16] out of concerns of daytime fatigue since she had returned to school.  Plaintiff indicated that she was going for a colonoscopy in the next few weeks.  On examination, Plaintiff's mood was stable and appropriate, her Mirapex was maintained for her PLMD with chronic fatigue and fibromyalgia (Docket No. 12, p. 648 of 764).

---

[13] Keflex is prescribed to treat bacterial infections. *Keflex oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD (Sept. 8, 2014, 9:39 AM), http://www.webmd.com/drugs/2/drug-6859/keflex-oral/details.

[14] Reglan is prescribed to treat certain conditions of the stomach and intestines. *Reglan oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD (Sept. 8, 2014, 9:40 AM), http://www.webmd.com/drugs/2/drug- 6177/reglan-oral/details.

[15] Trazodone is prescribed to treat depression. *Trazodone oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD (Sept. 8, 2014, 9:41 AM), http://www.webmd.com/drugs/2/drug-11188-89/trazodone-oral/trazodone/details.

[16] Mirapex is prescribed to treat certain medical conditions including restless legs syndrome and Parkinson's disease. *Mirapex oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Sept. 8, 2014, 9:45 AM), http://www.webmd.com/drugs/2/drug-3683/mirapex-oral/details.

- On October 14, 2010, Plaintiff underwent evaluation for mid-thoracic back pain after falling from her bed. Plaintiff reported significant pain to her back from a second thoracic vertebrae spinous process fracture. Plaintiff also indicated being more anxious and having difficulty sleeping. On examination, Plaintiff was described as having tenderness along her mid-thoracic and her right knee had some mild ecchymotic[17] areas. Dr. Mineo recommended Plaintiff follow up with Dr. Brower, and prescribed her Percocet and Ativan (Docket No. 12, p. 648 of 764).

- On November 4, 2010, Plaintiff had a follow-up examination which revealed that her blood pressure was elevated, and she had tenderness to her right rhomboid and trapezius area. Plaintiff was given a lidocaine injection in her right arm, prescribed lisinopril[18] for her hypertension, and given referrals to Dr. Leone for acupuncture for her fibromyalgia, and for physical therapy for a functional capacity examination (Docket No. 12, p. 649 of 746).

- On November 30, 2010, Plaintiff presented complaining primarily of anxiety and panic attacks, headaches and ringing in her right ear following a concussion. Plaintiff also complained of fullness in her neck, and URI symptoms. On examination, Plaintiff was noted having tenderness to palpation of her left lateral lower rib cage, her neck revealed some mild cervical adenopathy, which was small and mobile. Plaintiff was prescribed BuSpar[19] and Xanax[20] instead of Ativan for her mood (Docket No. 12, p. 649 of 764).

- On December 16, 2010, Plaintiff followed-up concerning her anxiety and reported that Xanax had been extremely helpful and that she had been able to get at least four hours of sustained sleep, but noted increased stress. Plaintiff did not start taking her BuSpar medication due to fear of side effects. On examination, Dr. Mineo noted Plaintiff mood was stable and appropriate. Dr. Mineo continued Plaintiff's Xanax medication (Docket No. 12, p. 650 of 764).

- On February 8, 2011, Plaintiff complained of congestion. After an examination, Dr. Mineo

---

[17] Ecchymosis is the escape of blood into the tissues from ruptured blood vessels marked by a livid black-and-blue or purpose sport or area. WEBSTER'S NEW EXPLORER MEDICAL DICTIONARY 210 (Merriam-Webster, New ed. 2006).

[18] Lisinopril is prescribed to treat hypertension by lowering high blood pressure to prevent stroke, heart attacks and kidney problems. *lisinopril oral: Uses, Side Effects, Interactions, Pictures Warnings & Dosing,* WEBMD, (Sept. 8, 2014, 9:50 AM), http://www.webmd.com/drugs/2/drug-6873/lisinopril-oral/details.

[19] BuSpar is prescribed to treat anxiety. BuSpar oral: *Uses, Side Effects, Interactions, Pictures Warnings & Dosing,* WEBMD, (Sept. 8, 2014, 9:52 AM), http://www.webmd.com/drugs/2/drug-9036/buspar-oral/details.

[20] Xanax is prescribed to treat anxiety and panic disorders. *Xanax oral: Uses, Side Effects, Interactions, Pictures Warnings & Dosing,* WEBMD, (Sept. 8, 2014, 9:53 AM), http://www.webmd.com/drugs/2/drug-9824/xanax-oral/details.

diagnosed Plaintiff with acute sinusitis and prescribed doxycycline hyclate[21] (Docket No. 12, p. 651 of 764).

- On May 31, 2011, Plaintiff presented for a follow-up examination after visiting the hospital. Plaintiff complained that she still felt "yucky" and had some left lower quadrant abdominal pain. Plaintiff reported that her white blood count was elevated in blood work in the ER.  On examination, Plaintiff had some mild left lower quadrant abdominal tenderness, and was diagnosed with abdominal pain, leukocytosis,[22] and insomnia due to a medical condition.  Plaintiff's medications were maintained (Docket No. 12, pp. 652-653 of 764).

- On August 1, 2011, Plaintiff complained of right shoulder pain for three days which had gotten progressively worse after doing yard work.  On examination, Plaintiff was described having tenderness over right upper medial scapula.  Dr. Mineo diagnosed Plaintiff with a back sprain, benign hypertension, generalized anxiety disorder, and fibromyalgia. Plaintiff was given a lidocaine injection in her right trapezius (Docket No. 12, p. 655 of 764).

- On August 4, 2011, Plaintiff complained of left shoulder pain after picking up her ten-pound grandchild. After examination, Plaintiff's left rhomboid was injected with lidocaine and Flexeril[23] was prescribed (Docket No. 12, pp. 656-657 of 764).

- On August 29, 2011, Plaintiff presented complaining of ear pressure, tinnitus in her right ear, being able to hear her heart beat in her left ear, arm, and neck pain.  Plaintiff was diagnosed with unspecified tinnitus and cervicalgia,[24] given an injection, and referred to Dr. Brower (Docket No. 12, pp. 658-659 of 764).

- On September 30, 2011, Plaintiff visited Dr. David Uhall, MD complaining of head and chest pain and symptoms including sneezing, coughing and fatigue.  Plaintiff was diagnosed her with acute sinusitis and fibromyalgia and prescribed Zithromax[25] (Docket No. 12, p. 660 of 764).

---

[21] Doxycycline hyclate is prescribed to treat bacterial infections including those that cause acne. Doxycycline hyclate oral: *Uses, Side Effects, Interactions, Pictures Warnings & Dosing,* WEBMD, (Sept. 8, 2014, 9:55 AM), http://www.webmd.com/drugs/2/drug-8648-7073/doxycycline-hyclate-oral/doxycycline-oral/details.

[22] Leukocytosis is an abnormally high number of white blood cells in the blood circulation, which is most commonly the result of an infection. *leukocytosis (medical disorder)*, BRITANNICA ONLINE ENCYCLOPEDIA, (Sept. 8, 2014, 9:57 AM), http://www.britannica.com/EBchecked/topic/337748/leukocytosis.

[23] Flexeril is prescribed to treat muscle spasms. *Flexeril oral: Uses, Side Effects, Interactions, Pictures Warnings & Dosing,* WEBMD, (Sept. 8, 2014, 9:59 AM), http://www.webmd.com/drugs/2/drug-11372/flexeril-oral/details.

[24] Cervicalgia is neck pain. *Cervical spondylosis and neck pain*, PMC U.S. NAT'L LIBRARY OF MEDICINE NAT'L INST. OF HEALTH, (Sept. 8, 2014, 10:04 AM), http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1819511/

[25] Zithromax is prescribed to treat bacterial infections. *Zithromax oral: Uses, Side Effects, Interactions, Pictures Warnings & Dosing,* WEBMD, (Sept. 8, 2014, 10:07 AM), http://www.webmd.com/drugs/2/drug-1322-3223/zithromax- oral/azithromycin250-500mg-oral/detail.

- On October 20, 2011, Plaintiff followed-up with Dr. Mineo after being hospitalized for a partial small bowel obstruction.  Plaintiff also complained of a corn on her left foot.  On examination, the bottom of Plaintiff's left foot was calloused with a hyperkeratoic area of skin noted along the ball of her foot which was paired down with a scalpel.  Dr. Mineo recommended off loading of her hyperkeratotic skin lesion and to avoid walking barefoot (Docket No. 12, pp. 661-662 of 764).

- On December 20, 2011, Plaintiff presented for a two-month follow-up.  On examination, no abnormalities were documented for Plaintiff.  She was prescribed Xanax for her generalized anxiety disorder, Dr. Mineo discussed support groups with Plaintiff for her fibromyalgia, and she was advised to quit smoking (Docket No. 12, pp. 663-664 of 764).

- On December 22, 2011, Plaintiff complained of sinus pressure, a headache, and left ear pain.  On examination, Dr. Mineo prescribed Plaintiff doxcycline hyclate, Auralgan solution for her ear pain, and encouraged her to try sudafed for her acute sinusitis (Docket No. 12, pp. 665-666 of 764).

**5.  HOSPITAL TREATMENT & TESTING RECORDS - SUMMA HEALTH SYSTEM**

- On April 28, 2009, Plaintiff was transported by ambulance to the Emergency Department (ED) complaining of neck and arm pain after painting a ceiling.  On examination, Plaintiff had midline and paraspinal tenderness to palpation in the C6-C7 region and mild pain in her left shoulder with abduction, but her range of motion was normal.(Docket No.12, pp. 299-309 of 764). A MRI of Plaintiff's shoulder revealed supraspinatus tendinopathy and biceps tenosynovitis, but  no evidence of a rotator cuff tear (Docket No. 12, p. 310 of 764).   Another MRI of Plaintiff's cervical spine showed multilevel cervical degenerative changes, which were documented as greatest at C6-7 with a large left paracentral disc herniation and overall moderate canal stenosis at C5-5 (Docket No.12, pp. 311-312 of 764).

- On April 30, 2009, Plaintiff was hospitalized after presenting with severe cervical radiculopathy symptoms and intractable pain.  Dr. Mineo diagnosed Plaintiff with cervical radiculopathy with large cervical disc herniation, intractable pain, and fibromyalgia.  Plaintiff was referred to Dr. Tipton for a consultation and prescribed Robaxin[26] and Percocet (Docket No. 12, pp. 535-536 of 764).

- On May 5, 2009, Plaintiff had a cervical epidural steroid injection with fluoroscopic guidance at St. Thomas Hospital, which was performed by Dr. Kyle D. Tipton, MD (Docket No. 12, p. 279-296 of 764).

- On May 13, 2009, visited the hospital three separate times complaining of chest pain, severe pain, and neck and left-sided arm pain, which had not improved with an epidural steroid injection (Docket No. 12, pp. 709; 730-737 of 764).  Plaintiff was hospitalized and  examination reveled  evidence of degenerative disc disease with a large disc herniation setting the foramen at C6-7 off to the left.

---

[26] Robaxin is prescribed to treat muscle spasms and pain. *Robaxin oral: Uses, Side Effects, Interactions, Pictures Warnings & Dosing,* WEBMD, (Sept. 8, 2014, 10;10 AM), http://www.webmd.com/drugs/2/drug-11197/robaxin-oral/details.

Plaintiff was diagnosed with a herniated disc at C6-7 on the left.  On May 15, 2009, Plaintiff underwent an anterior cervical discectomy with fusion with allograft bone and atlantis plate fixation at C6-7 off to the left.  Plaintiff was discharged on May 16, 2009 with instructions to wear a cervical collar and she was prescribed Vicodin for pain (Docket No. 12, pp. 709-729 of 764).

- On July 6, 2009, Plaintiff underwent a Dexa Scan/Osteopenia, which revealed evidence of osteopenia,[27] and that she had an increased risk of fracture (Docket No. 12, pp. 335-337 of 764).

- On November 15, 2009, Plaintiff had a CT scan taken of her abdomen to examine her left adrenal gland mass.  Plaintiff's right adrenal gland was normal, but there was nodular enlargement of the left adrenal gland, with decreased attenuation on the noncontrast images.  After review of Plaintiff's prior CT imagines, Dr. Alfred Haight, DO, opined Plaintiff's lesion on her gland had been stable over the previous five years  (Docket No. 12, pp. 332-333 of 764).

- On September 17, 2010, Plaintiff had a colonoscopy performed by Dr. Rajinder Parmar, MD, and had a polyp removed and sent to pathology for a biopsy (Docket No. 12, pp. 439-440 of 764).

- On June 13, 2010, Plaintiff was tramported by ambulance to the ED and complained of arm pain following a recent hospitalization in another state for a small bowel obstruction.  On examination, Plaintiff's vital signs were within normal limited, but she had minimal warmth and erythema of her left arm.  Dr. Michelle Blanda diagnosed Plaintiff with phlebitis, a cough, and prescribed clindamycin[28] (Docket No. 12, pp. 480-481; 488 of 764).

- On June 18, 2010, Plaintiff was brought to the ED by ambulance complaining of abdominal pain.  A CT scan revealed her flank was unremarkable, CBC normal, except for a white blood cell count of 13.  Plaintiff was prescribed Colace,[29] Reglan, and discharged (Docket No. 12, pp. 451-452; 463; 675-676 of 764).

- On August 6, 2010, Plaintiff underwent a Diagnostic Polysomnogram after being referred by Dr. Mineo for possible sleep apnea.  The testing revealed that Plaintiff demonstrated mild snoring with no significant obstructive sleep apnea possibly caused by a case of upper airway resistence syndrome (Docket No. 12, pp. 673; 680-681 of 764).

- On October 12, 2010, Plaintiff arrived at ED by ambulance complaining of head, neck and bilateral

---

[27] Osteopenia is lower than normal bone density, which is not low enough to qualify as osteoporosis. *What is Osteopenia? Causes, Symptoms, Treatments*, WEBMD, (Sept. 8, 2014, 10:12 AM), http://www.webmd.com/osteoporosis/tc/osteopenia-overview.

[28] Clindamycin is an antibiotic prescribed to treat bacterial infections. *clindamycin HCL oral: Uses, Side Effects, Interactions, Pictures Warnings & Dosing,* WEBMD, (Sept. 8, 2014, 10:14 AM), http://www.webmd.com/drugs/2/drug- 12235/clindamycin-hcl-oral/details.

[29] Colace is prescribed to treat occasional constipation. *Colace oral: Uses, Side Effects, Interactions, Pictures Warnings & Dosing,* WEBMD, (Sept. 8, 2014, 10:16 AM), http://www.webmd.com/drugs/2/drug-4576/colace-/details.

shoulder pain after falling out of bed and landing on her hardwood floor.  On examination, Dr. Alison P. Southern, MD, described Plaintiff as afebrile, having cervical, thoracic, lumbar spinal, chest, and bilateral shoulder tenderness.  X-rays taken of Plaintiff's chest and bilateral shoulder revealed nothing acute.  A CT scan of the cervical, thoracic, and lumbar spine showed a T2 spinous process fracture.  Plaintiff was administered Morphine and Phenergan in the hospital and discharged (Docket No. 12, pp. 404-437 of 764).

- On October 6, 2011, Plaintiff arrived at the ED complaining of abdominal pain for two days, which had gradually worsened and was of an eight out of ten in terms of intensity.  On examination, Plaintiff had an elevated blood pressure.  An abdominal series showed a small bowel obstruction with the possibility of infection or ischemia.  Plaintiff's CBC was noted showing leukocytosis of 13.5, but the remaining labs were normal.  Plaintiff was given morphine, Phenergan and was admitted under surgery service until discharged on October 8, 2011 (Docket No. 12, pp. 583-636 of 764).

## 6.  OFFICE TREATMENT RECORDS - DR. RAJIV V. TALIWAL, MD

- On April 30, 2009, Plaintiff had a consultation for a four week history of neck pain radiating into her left shoulder, arm, forearm and hand with numbness and tingling.  On examination, Plaintiff had full cervical range of motion, positive Spurling's to the left, limited on left side rotation with normal strength in her arms with 2+ symmetric reflex.  X-rays revealed loss of her normal cervical lordosis with no instability.  A MRI showed disc herniation off to the left at C6-7, mild disc degeneration with rightward upper extrusion at C5-6.  Dr. Taliwal discussed treatment options including observation, therapy, injections, and surgery (Docket No. 12, p. 268 of 764).

## 7.  OFFICE TREATMENT RECORDS - CRYSTAL CLINIC NORTH COAST SPINE CENTER - DR. RICHARD S. BROWER, MD

- On June 25, 2009, Plaintiff was evaluated by Nancy M. Vickroy, PAC, who described Plaintiff as doing very well after surgery, but that she was very still and did not move her neck or shoulders much in her cervical collar.  X-rays showed good cervical alignment and it was noted that her vertebrae appeared rather osteopenic (Docket No. 12, pp. 350-351 of 764).

- On September 15, 2009, Plaintiff complained that her fibromyalgia had flared up and she was having lower back issues.  Dr. Brower noted that Plaintiff was doing pretty well with her neck and had reported that her neck and arm were significantly better than before surgery.  X-rays revealed nice solid fusion at C6-7 and he reported that the graft appeared to be incorporating and the plate and screws were stable (Docket No. 12, pp. 347-348 of 764).

- On November 3, 2009, Plaintiff complained of left-sided back ache with a little bit of leg pain.  She reported that she could walk at least a half mile and was preparing to return to work.  On examination, Plaintiff had mildly reduced range of motion in her lower back due to stiffness  and was losing a little bit of internal rotation of both hips, which was described as not severe.  Plaintiff's x-rays revealed a "little bit" of degenerative scoliosis.  Dr. Brower recommended physical therapy before considering surgery (Docket No. 12, pp. 344-345 of 764).

- On October 28, 2010, Plaintiff underwent further evaluation after falling out of bed.  Plaintiff complained of interscapular pain and headaches.  X-rays showed indications of a split of the T2 spinous process, degenerative disc disease thoracic and a nice solid fusion at C6-7.  Dr. Brower indicated the spinous process fracture was nothing to be concerned about at that point and that no treatment should be ordered (Docket No. 12, pp. 576-578 of 764).

- On September 13, 2011, Plaintiff reported riding on the back of a motorcycle with a helmet that did not fit properly and she kept holding it on with her hand. Subsequently, she experienced  tingling in her left arm.  Plaintiff complained of numbness and some pain and weakness.  On examination, Plaintiff had good range of motion of her cervical spine.  Plaintiff's x-rays revealed a well-healed graft at C6-C7, but it was noted that she may be getting a little bit of osteophyte forming from the posterior part of the superior endplate of C6.  Plaintiff was referred to physical therapy for scapular stabilization exercises and a little bit of traction (Docket No. 12, pp. 579-581 of 764).

**8.  HOSPITAL TREATMENT RECORDS - GILBERT MERCY MEDICAL CENTER**

- On June 5, 2010, Plaintiff presented to the ER for abdominal pain which had gradually worsened.  On examination, Plaintiff's abdomen was soft, with diffuse tenderness to palpation, more prominent over the left mid and lower abdomen.  A CT scan revealed findings suggestive of small bowel obstruction with adhesions suspected and a small gallstone.  Plaintiff was diagnosed with a small bowel obstruction and admitted to the hospital on June 6, 2010.  Plaintiff was prescribed Telmisartan,[30] Prilosec, Asprin, Tazorac cream,[31] and discharged after becoming stable on June 10, 2010 (Docket No. 12, pp. 742-760 of 764).

- On June 11, 2010, Plaintiff presented to the ER complaining of left forearm redness and swelling.  It was opined that Plaintiff was allergic to the tape where her IV had been placed during a prior hospital visit.  Plaintiff was given Ancef[32] and diagnosed with left forearm superficial phlebitis and questionable mild cellulitis (Docket No. 12, pp. 762-764 of 764).

**C.  MEDICAL SOURCE STATEMENTS**

**1.  NANCY J. KEOGH, PHD - PSYCHOLOGIST**

---

[30] Telmisartan is prescribed to treat high blood pressure. *Telmisartan oral: Uses, Side Effects, Interactions, Pictures Warnings & Dosing,* WEBMD, (Sept. 8, 2014, 10:19 AM), http://www.webmd.com/drugs/2/drug-16800/telmisartan-oral/details.

[31] Tazorac Topical cream is used to treat psoriasis or acne. *Tazorac topical: Uses, Side Effects, Interactions, Pictures Warnings & Dosing,* WEBMD, (Sept. 8, 2014, 10:21 AM), http://www.webmd.com/drugs/2/drug-3329/tazorac-top/details.

[32] Ancef is an antibiotic used to treat and prevent bacterial infections. *Ancef injection: Uses, Side Effects, Interactions, Pictures Warnings & Dosing,* WEBMD, (Sept. 8, 2014, 10:23 AM), http://www.webmd.com/drugs/2/drug- 3496/ancef-inj/details.

An undated questionnaire describes Plaintiff's mental health.  Dr. Keogh noted that Plaintiff's restrictions of daily activities include physical problems from poor health which limit her physical activity, and that anxiety contributes to her fatigue.  Dr. Keogh indicated that Plaintiff is unable to pursue formerly pleasurable interests and habits due to her anxiety, but that her self care and hygiene were adequate.  Plaintiff's social interactions were also adequate, but her anxiety made her reclusive.  Dr. Keogh described the frequency of Plaintiff's anxiety as daily and of moderate intensity.  She added that Plaintiff's decompensation could be triggered by the stress inherent in a work environment.  Plaintiff's symptoms of fatigue, pain and anxiety, according to Dr. Keogh, have existed for many years.  Dr. Keogh indicated that Plaintiff has had limited success treating her symptoms with medication and opined that Plaintiff is unable to deal with any more stress since having suffered the death of her parents, her best friend and in having many medical problems including a heart attack and ruptured disc in her neck.  Plaintiff's diagnosis was listed as Anxiety Disorder (Docket No. 12, pp. 353-354 of 764).

2.    **DR. KEVIN MINEO, MD - PRIMARY CARE PHYSICIAN**

On November 12, 2010, Dr. Mineo completed a Physical RFC form for Plaintiff indicaing that she could sit up to one hour continuously or two hours with rest, and could stand and walk for less than a half-hour continuously or up to an hour with rest.  The assessment notes that Plaintiff is capable of lifting up to 20 pounds occasionally, but is only able to carry 11 pounds occasionally.  He further commented  that Plaintiff can occasionally bend and reach above shoulder level, but should never squat, crawl or climb.  According to the assessment, Plaintiff can use her right foot for repetitive movements in operating foot controls, but could not use her left foot or both feet for such tasks.  The assessment reflects that Plaintiff's impairments and treatment would cause her to miss work more than three times a month and recommended  total restrictions from unprotected heights, moderate restrictions for moving machinery and exposure to dust, fumes, and gases, and mild restrictions for driving automobile equipment and exposure to marked changes in temperature and humidity.  Finally, the assessment notes that Plaintiff is unable to return to full time employment and that the conditions preventing her

19

from returning to work are expected to persist longer than 12 months (Docket No. 12, pp. 541 of 764).

**D.    CONSULTATIVE EXAMINATIONS**

**1.    GARY J. SIPPS, PH.D. - PSYCHOLOGICAL**

On August 7, 2010, Plaintiff underwent a psychological consultative examination and she reported previously working as a real estate appraiser, and part-time at Wal-mart until December 2008.  Plaintiff reported past psychological-psychiatric treatment with Nancy Keogh, Ph.D, during the previous winter, but denied any other treatment history.  Plaintiff indicated that she smokes two packs of cigarettes in an average week.  Plaintiff detailed her medical history, but noted that her fibromyalgia is her primary concern.  Based on his clinical interview, Dr. Sipps diagnosed Plaintiff with Adjustment Disorder and assessed her a Global Assessment of Functioning[33] Score of 63.  Dr. Sipps opined that Plaintiff's capacity for remote recall, understanding of both simple and complex instructions all appeared unimpaired, while her capacity for sustained attention, concentration, persistence, and pace, social interaction, capacity for stress tolerance, and functioning were all mildly impaired.  Plaintiff's symptoms were described as being mild (Docket No. 12, pp. 355-360 of 764).

**2.    DR. CHIMEZIE AMANAMBU, MD - PHYSICAL**

On August 17, 2010, Plaintiff underwent a physical consultative examination and reported generalized body pain.  Plaintiff was described as in no obvious distress and having no obvious physical abnormalities.  Her vision was 20/30 in her right eye and 20/25 in her left eye without corrective lenses.  On physical examination, Dr. Amanambu found Plaintiff's strength and range of motion in her extremities normal, and her metacarpophalangeal(MCP), proximal interphalangeal (PIP), interphalangeal joint (IP), and distal interphalangeal

---

[33] The Global Assessment of Functioning (GAF) scale considers psychological, social and occupational functioning using a hypothetical continuum of mental health illness.  A score of 63 corresponds with some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, and having some meaningful interpersonal relationships *See Global Assessment of Functioning (GAF) Scale*, MICH. ST. UNIV., (Sept. 9, 2014, 10:36 AM), https://www.msu.edu/course/sw/840/stocks/pack/axisv.pdf, citing DSM-IV-TR, p. 34.

(DIP) joints normal.  Plaintiff's dorsolumbar spine was also noted as normal.  Dr. Amanambu's assessment reflects a history of fibromyalgia and he found Plaintiff is limited to light work, can lift 20 pounds, stand for six hours, and is otherwise capable of walking, bending, twisting, crawling, carrying, and reaching (Docket No. 12, pp. 363-369 of 764).

## E.   STATE AGENCY FINDINGS

### 1.   MENTAL RFC & PRT ASSESSMENTS - KARLA VOYTEN, PH.D.

On August 23, 2010, Dr. Voyten rendered a mental RFC for Plaintiff and opined that Plaintiff is moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Voyten assessed no other limitations for Plaintiff.  Based on Plaintiff's interview and the consultative examiner's report, Dr. Voyten concluded Plaintiff could complete tasks in environments without time or production pressure (Docket No. 12, pp. 370-373 of 764).

The PRT assessment also completed by Dr. Voyten on August 23, 2010, states that Plaintiff's diagnosis for Anxiety Disorder and Adjustment disorder satisfy the 'A' criteria for listing 12.06 for Anxiety-Related Disorders. Under the 'B' criteria of the listing, Plaintiff's restriction of daily activities and difficulties in maintaining social functioning were rated as mildly limited.  Plaintiff's difficulties in maintaining concentration, persistence, and pace were rated as moderately limited, however, Dr. Voyten found no episodes of decompensation of extended duration. Dr. Voyten also determined that the evidence did not establish the presence of any 'C' criterion (Docket No. 12, pp. 374-385 of 764).

### 2.   PHYSICAL RFC FINDINGS - DR. W. JERRY MCCLOUD, MD

On September 17, 2011, Dr. McCloud completed a physical RFC for Plaintiff and found that she is able to occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand, walk, and sit for approximately six hours during an eight-hour workday.  Plaintiff's ability to push and pull was assessed as unlimited.  Based on

Plaintiff's medical records, Dr. McCloud found Plaintiff also limited to no ropes, ladders, or scaffolds (Docket No. 12, pp. 388-395 of 764).

### 3.    PHYSICAL RFC FINDINGS - DR. WILLA CALDWELL, MD

On February 22, 2011, Dr. Caldwell found Plaintiff is capable of occasionally lifting and carrying 20 pounds, frequently carry and lifting 10 pounds, and that she could stand, walk, and sit for about six hours during a normal eight-hour workday with normal breaks.  Plaintiff's ability to push and pull were assessed as unlimited. Dr. Caldwell found Plaintiff could frequently climb ramps and stairs, but could never climb ladders, ropes, or scaffolds, and could occasionally stoop and crouch.  Plaintiff was also assessed a limited restriction for reaching in all directions.  No visual, communicative, or environmental limitations were included (Docket No. 12, pp. 543-550 of 764).

## III.  STANDARD OF DISABILITY

The Social Security Act sets forth a five-step sequential evaluation process for determining whether an adult claimant is disabled under the Act. *See* 20 C.F.R. § 416.920(a) (West 2014); *Miller v. Comm'r Soc. Sec.*, 2014 WL 916945, *2 (N.D. Ohio 2014).  At step one, a claimant must demonstrate she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007)(citing *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).  At step two, the claimant must show that she suffers from a "severe impairment." *Colvin*, 475 F.3d at 730.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id*. (citing *Abbott*, 905 F.2d at 923).  At step three, the claimant must demonstrate that her impairment or combination of impairments meets or medically equals the listing criteria set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 416.920(d) (West 2014).  If the claimant meets her burden she is declared disabled, however, if she does not, the Commissioner must determine her residual functional capacity. 20 C.F.R. § 416.920(e) (West 2014).

A claimant's residual functional capacity is "the most [the claimant] can still do despite [the claimant's]

limitations." 20 C.F.R. § 416.945(a) (West 2014). In making this determination, the regulations require the Commissioner to consider all of the claimant's impairments, including those that are not "severe." 20 C.F.R. § 416.945(a)(2) (West 2014). At the fourth step in the sequential analysis, the Commissioner must determine whether the claimant has the residual functional capacity to perform the requirements of the claimant's past relevant work. 20 C.F.R. § 416.920(e) (West 2014). Past relevant work is defined as work the claimant has done within the past 15 years (or 15 years prior to the date of the established disability), which was substantial gainful work, and lasted long enough for the claimant to learn to do it. 20 C.F.R. §§ 416.960(b), 416.965(a) (West 2014). If the claimant has the RFC to perform her past work, the claimant is not disabled. 20 C.F.R. § 416.920(f) (West 2014). If, however; the claimant lacks the RFC to perform her past work, the analysis proceeds to the fifth and final step. *Id.*

The final step of the sequential analysis requires the Commissioner to consider the claimant's residual functional capacity, age, education, and work experience to determine whether the claimant can make an adjustment to other work available. 20 C.F.R. §§ 416.920(a)(4)(v), (g) (West 2014). While the claimant has the burden of proof in steps one through four. The Commissioner has the burden of proof at step five to show "that there is work available in the economy that the claimant can perform." *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). The Commissioner's finding must be "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)(citation omitted). If a claimant can make such an adjustment, the claimant will be found not disabled. 20 C.F.R. §§ 416.920(a)(4)(v), (g) (West 2014). If an adjustment cannot be made then the claimant is disabled. *Id.*

### IV. COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ King made the following findings:

1.     Plaintiff meets the insured status requirements of the Social Security Act through December 31,

23

2013.

2.  Plaintiff has not engaged in substantial gainful activity since March 4, 2009, the alleged onset date.

3.  Plaintiff has the following severe impairments: (1) degenerative disc disease and osteoarthritis of the cervical spine, status post discectomy and fusion at the C6-C7 on May 15, 2009; (2) degenerative disc disease of the thoracic spine; status post fracture of the T12 spinous process on October 12, 2010; (3) mild scoliosis of the spine; (4) supraspinatus tendinopathy and biceps tenosynovitis of the left shoulder, per MRI on April 28, 2009; (5) fibromyalgia; (6) coronary artery disease; (7) status post myocardial infarction in approximately 1999, per EKG on May 13, 2009; (8) tinnitus; (9) bilateral hearing loss with probable ossicular fixation in the right ear; (10) history of episodes of sinusitis; (11) nasal septal deviation to the right; (12) turbinate hypertrophy; and (13) generalized anxiety disorder with a history of panic attacks.

4.  Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, the ALJ found that Plaintiff has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except she can lift and/or carry twenty pounds occasionally and ten pounds frequently.  She can stand and/or walk (with normal breaks) for about six hours in an eight-hour workday.  She can sit (with normal breaks) for about six hours in an eight-hour workday.  She has no limitations in her ability to push and/or pull (including the operation of hand and/or foot controls), other than as limited by her restrictions in lifting and/or carrying.  She can occasionally climb ramps and stairs.  She can never climb ladders, ropes or scaffolds.  She can occasionally stoop, kneel, crouch and crawl.  She can frequently reach in all directions, except that she can only occasionally reach overhead bilaterally.  She needs to avoid concentrated exposure to respiratory irritants such as fumes, odors, dust, gases, poor ventilation, etc.  She has some bilateral hearing loss and cannot hear well at DOT noise levels four and five.  However, she can hear and understand a normal conversational voice at DOT noise levels one, two, and three.  She cannot work in an environment with high quotas, strict time limits or deadlines, or fast-paced production demands (such as those encountered in piecework or on a fast moving assembly line).  Additionally, the Plaintiff needs to be able to alternate between sitting and standing every thirty minutes, with five minutes in the alternative position at the workstation before resuming the original position of sitting or standing.

6.  Plaintiff is capable of performing past relevant work as a residential appraiser (DOT # 188.167-010).  This work does not require the performance of work-related activities precluded by Plaintiff's residual functional capacity.

7.  Plaintiff has not been under a disability, as defined in the Social Security Act, from March 4, 2009, through the date of this decision.

(Docket No. 12, pp. 18-32 of 764).

## V. Standard of Review

24

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 832-33 (6th Cir. 2006).  On review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.  *Id.* (citing *Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)).  The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  *Miller*, 2014 WL 916945, at *3 (quoting 42 U.S.C. § 405(g)).  "The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Substantial evidence is more than a scintilla of evidence but less than a preponderance."  *Miller*, (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007)).  "An ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'"  *Cole*, 661 F.3d at 937 (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference."  *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)(citations omitted).

## VI. DISCUSSION

### A.    PLAINTIFF'S ALLEGATIONS

Plaintiff alleges that the ALJ's decision is not supported by substantial evidence and argues that the ALJ failed to: (1) appropriately analyze listing 1.04; (2) properly weigh the opinion of treating physician, Dr. Mineo, in his analysis; and (3) adequately support his decision to discount Dr. Mineo's opinions with  "good reasons" (Docket Nos 13 & 17).

25

**B.    DEFENDANT'S RESPONSE**

Defendant argues that the ALJ's decision with respect to listing 1.04 is supported by substantial evidence and that there is no higher articulation standard at step-three in the analysis so long as the ALJ's findings of fact are supported by substantial evidence (Docket No. 16).  Defendant also maintains that the ALJ's decision to discount Dr. Mineo's opinion is supported by substantial evidence because Dr. Mineo's RFC assessment for Plaintiff is inconsistent with the medical examinations, Plaintiff's course of treatment following surgery, and her activities of daily living (Docket No. 16).

**C.    ANALYSIS**

**1.    THE ALJ'S STEP THREE ANALYSIS**

Plaintiff argues that the ALJ erred by failing to analyze listing 1.04 and articulate a rationale for why its criteria was not met or equaled (Docket No. 13, pp. 8-9 of 20).  According to Plaintiff, there are facts in the record that should have been analyzed under listing 1.04(A) (Docket No. 13, p. 8 of 20).  Without fully outlining the basis for its argument,  Plaintiff maintains that the Court will be unable to determine whether significant probative evidence was considered or ignored (Docket No. 13, pp. 8-9 of 20).

Defendant disagrees and contends that Plaintiff did not meet her burden of showing that she meets or equals a listed impairment (Docket No. 16, p. 9 of 19).  Defendant also cites Sixth Circuit case law recognizing that there is no "heightened articulation standard" for the ALJ's step-three findings, so long as there is substantial evidence in the record to support the ALJ's decision (Docket No. 16, p. 9 of 19).  Defendant contends that the ALJ's step-three findings are supported by substantial evidence (Docket No. 16, pp. 10-11 of 19).  Alternatively, Defendant argues that even if the ALJ had engaged in an analysis under listing 1.04, that Plaintiff would not have met or equaled the listing since she had no positive straight leg raising test as required under the listing criteria for 1.04(A) (Docket No. 16, p. 10 of 19).  Defendant's contentions are well-taken.

At step-three, the claimant bears the burden of showing she meets or equals a listing impairment.  *Her v.*

26

*Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). "[A]n ALJ must determine whether the claimant's impairments meets or is equivalent in severity to a listed disorder." *Beauchamp v. Comm'r of Soc. Sec.*, 2014 WL 1154117, at *7 (N.D. Ohio 2014)(quoting *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 653 (6th Cir. 2009)). When a claimant's impairments meets or equals a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1, the Commissioner will find the claimant disabled. 20 C.F.R. § 404.1520(d) (West 2014).

In the Listing of Impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1, under the Musculoskeletal System, the regulations include guidelines for the ALJ to consider in his or her analysis. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00 (West 2014). For example, in the guideline section concerning documentation, the regulation notes that "[m]usculoskeletal impairments frequently improve with time or respond to treatment," and that the "longitudinal clinical record is generally important for the assessment of severity and expected duration of an impairment . . ." 20 C.F.R. Part 404, Subpart P, Appendix 1, 1.00(H)(1) (West 2014). The next section concerning the effects of treatment, advises that treatment for musculoskeletal disorders may have beneficial or adverse affects and that such treatment "must be considered in terms of its effectiveness in ameliorating the signs, symptoms, and laboratory abnormalities of the disorder, and in terms of any side effects that may further limit the individual." *Id.* at § 1.00(I). Yet another section instructs the ALJ to consider a claimant's response to treatment on an individual basis and to consider the effects of such treatment on the claimant's functional ability. *Id.* at §1.00(I)(2).

Both the regulations and the Listing of Impairments requires the ALJ to *consider* the severity of an impairment, however; there is no requirement that the ALJ provide a rationale for a claimant's failure to satisfy every listing section. *See Apley v. Comm'r of Soc. Sec.*, 2013 WL 1316771, at *8 (E.D. Mich 2013)(unpublished)(citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200-01 (9th Cir. 1990)). In *Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1986), the Sixth Circuit held that the ALJ's findings at step-three should not be disturbed unless the court is persuaded that such findings are legally insufficient. *Id.* In a later unpublished

decision, the Sixth Circuit cited *Dorton* in rejecting an argument that an ALJ should spell out every consideration involved in his step-three analysis, noting that "*Dorton* supports the proposition that there is no heightened articulation standard where the ALJ's findings are supported by substantial evidence." *Bledsoe v. Barnhart*, 165 Fed.Appx. 408, 411 (6th Cir. 2006).

At issue is listing 1.04, which requires a claimant to establish she has a disorder of the spine with:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04 (West 2014). Although Plaintiff is correct that the ALJ's decision must contain sufficient analysis to allow for meaningful judicial review, Plaintiff fails to consider the entirety of the ALJ's decision in her argument since elsewhere in ALJ King's decision, it is clear that the ALJ considered Plaintiff's medical record with respect to her spinal impairments (Docket No. 17, p. 2 of 6).

In the section of his decision containing his RFC findings, ALJ King summarized the medical evidence, including the records of Plaintiff's degenerative disc disease, supraspinatus tendinopathy, scoliosis, and cervical radiculopathy (Docket No. 12, pp. 23-31 of 764). The ALJ's summary of the medical evidence in his decision is consistent with Plaintiff's medical record, which reflects Plaintiff's spinal condition improved following an anterior cervical discectomy procedure on May 15, 2009. Dr. Brower's treatment records indicate that the condition of Plaintiff's neck was improved and doing well in June and September of 2009 (Docket No. 12, pp. 350-351; 347-348 of 764). While Plaintiff suffered a spinous process fracture after falling out of bed in October 2010, Dr. Brower

28

found the injury was nothing to be concerned about and that Plaintiff was still doing fine (Docket No. 12, pp. 404-437; 648; 576-578 of 764).  During her consultative physical examination in August 2010, Plaintiff demonstrated no limitation of motion of her spine, motor loss, sensory or reflex loss, and her straight leg raising test was negative in both the sitting and lying positions according to Dr. Amanambu's findings (Docket No. 12, pp. 363-369 of 764). Despite Plaintiff's complaints of pain and weakness stemming from a motorcycle ride in September 2011, Dr. Brower noted that Plaintiff was still doing fine (Docket No. 12, pp. 579-581 of 764).

Although Plaintiff cites to a variety of medical records in support of her assertion that there is medical evidence to support each requirement for 1.04(A), most of those records predate her anterior cervical discectomy procedure, and the other records dated after her procedure consist of Plaintiff's subjective complaints uncorroborated by her treating sources (Docket No. 17, p. 1 of 6).  For example in one of the records cited by Plaintiff from September 8, 2009, Plaintiff complained of neck soreness, headaches, dizziness, clumsiness, unsteady gait, fatigue, problems with memory and concentration, nervousness, body pain and stiffness, dry eyes, blurry vision, ringing ears, numbness in her fingers, and pain which radiated from her neck to tailbone (Docket No. 12, p. 260 of 764).  During Dr. Mineo's objective physical examination, he found no focal neurologic defects and opined that Plaintiff's range of motion in her cervical spine had appeared to improve (Docket No. 12, p. 260 of 764). Seven days later, Plaintiff reported to Dr. Brower that her neck and arm were significantly better than before surgery and objective medical x-rays revealed a solid fusion at C6-7 and that her graft appeared to be incorporating and the plate and screws were stable (Docket No. 12, pp. 347-348 of 764). Neither of the treating sources who evaluated Plaintiff in September 2009, corroborate Plaintiff's subjective reports.  Contrary to Plaintiff's claims, the longitudinal clinical and medical record fails to yield the evidence which is required to satisfy the requirements of listing 1.04(A).

For these reasons, the undersigned Magistrate recommends the Court find the ALJ's determination not to conduct an analysis with respect to listing 1.04 is supported by substantial evidence.

2.    WHETHER THE ALJ'S DECISION TO DISCOUNT DR. MINEO'S OPINIONS IS SUPPORTED BY SUBSTANTIAL EVIDENCE

In her second assignment of error, Plaintiff alleges the ALJ failed to appropriately weigh the opinions of her treating physician, Dr. Kevin Mineo (Docket No. 13, pp. 11-15 of 20; Docket No. 17, pp. 4-5 of 6).  Plaintiff also alleges that the ALJ failed to provide "good reasons" for discounting Dr. Mineo's opinions (Docket No. 13, pp. 15-19 of 20).  Defendant disagrees and contends that the ALJ's decision to discount the opinions rendered in Dr. Mineo's RFC are supported by substantial evidence because Dr. Mineo's opinions are unsupported by the record, inconsistent with his own medical findings and Plaintiff's daily activities (Docket No. 16, pp. 12-17 of 19).

a.    THE TREATING PHYSICIAN RULE

Federal regulations prescribe certain standards an ALJ must comply with in assessing the medical evidence contained in the record.  The treating physician rule is one such standard and requires that a treating source's opinion be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and not otherwise "inconsistent with the other substantial evidence in the case record." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004)); *Blakley*, 581 F.3d at 406; *see also* SSR 96-2P, 1996 WL 374188, *1 (July 2, 1996).  The treating physician rule stems from the belief that a claimant's treating physicians are best positioned, as medical professionals, to provide a detailed picture of the claimant's impairment and can provide unique perspective that might not otherwise be obtained from the objective evidence or other reports of examinations. *See* 20 C.F.R. § 404.1527(c)(2) (West 2014).

Where a treating physician's opinion is not given controlling weight, there remains a rebuttable presumption that such opinion is entitled great deference. *Rogers*, 486 F.3d at 242 (citation omitted).  To reject a treating physician's opinions an ALJ must provide "good reason" for doing so in their decision to make it sufficiently clear

to "subsequent reviews the weight the adjudicator gave the treating source's medical opinion and the reasons for that weight." *Id.* (citing SSR 96-2P, 1996 WL 374188, *5). "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where the claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Wilson*, 378 F.3d at 544 (citation omitted). To comply with the obligation to provide good reasons for discounting a treating source's opinion, the ALJ must (1) state that the opinion is not supported by medically acceptable clinical and laboratory techniques or is inconsistent with other evidence in the case record; (2) identify evidence supporting such finding; and (3) explain the application of the factors listed in 20 C.F.R. § 404.1527(d)(2) to determine the weight that should be given to the treating source's opinion. *Allums v. Commissioner*, 2013 WL 5437046, *3 (N.D.Ohio 2013) (citing *Wilson,* 378 F. 3d at 546). Those factors require the ALJ to consider the length, frequency, nature and extent of the treatment relationship, the evidence the medical source presents to support their opinion (supportability), the consistency of the opinion with the record as a whole, the specialization of the opinion, and any other factors which tend to support or contradict the opinion. 20 C.F.R. § 416.927(c) (West 2014).

### b. DR. MINEO'S OPINION

Plaintiff testified that Dr. Mineo has been her primary care physician since 2007 (Docket No. 12, p. 65 of 764). The pertinent record from Dr. Mineo reflects that he treated Plaintiff approximately 28 times from February 2009 through December 2011 (Docket No. 12, pp. 257; 665-666 of 764).[34] Clearly Dr. Mineo is Plaintiff's primary care physician and a "treating source" pursuant to 20 C.F.R. § 416.902. As a treating source, Dr. Mineo's opinions were entitled to controlling weight under the treating physician rule so long as they were "well-supported by

---

[34] The undersigned Magistrate does not doubt that Plaintiff has continuously sought care from Dr. Mineo since 2007, but instead simply observes that the record of Dr. Mineo's treatment of Plaintiff goes as far back as 2009 in the record.

medically acceptable clinical and laboratory diagnostic techniques," and "not otherwise inconsistent with the other substantial evidence in the case record." *Hensley,* 573 F.3d at 266; 20 C.F.R. § 404.1527(d)(2) (West 2014). In his decision, the ALJ noted giving Dr. Mineo's opinions rendered in his RFC assessment of Plaintiff "little weight" finding they were based on Plaintiff's subjective complaints, unsupported by the objective medical record, and inconsistent with the Plaintiff's course of treatment following her neck surgery, and extensive activities of daily living (Docket No. 12, p. 29 of 764). The closing paragraphs of the RFC analysis contained in ALJ King's decision include additional explanation and reasoning for the ALJ's decision, noting that the record does not support Plaintiff's subjective complaints and cites the medical records which reflect that Plaintiff's condition improved after her cervical procedure in May 2009, and emphasizing that Plaintiff's activities of daily living are inconsistent with her symptoms (Docket No. 12, pp. 30-31 of 764).

ALJ King's decision clearly reflects his consideration of the § 404.1527(d)(2) factors. The ALJ's decision notes that Dr. Mineo is Plaintiff's primary care physician and details Dr. Mineo's treatment of Plaintiff (Docket No. 12, pp. 24-29 of 764). In fact, Dr. Mineo's examination findings are referenced throughout the ALJ's summation of Plaintiff's medical record (Docket No. 12, pp. 24-28 of 764). The only opinion, that the ALJ discounts belonging to Dr. Mineo, is the RFC assessment he signed and dated November 12, 2010 (Docket No. 12, p. 537 of 764). The RFC assessment reflects that Plaintiff could sit for one hour continuously or two hours with rest, and could stand or walk for less than a half hour continuously or one hour with rest (Docket No. 12, p. 537 of 764). Furthermore, it notes that Plaintiff is restricted in lifting, using her left or both feet for foot controls, has total, moderate or mild restrictions in being exposed to heights, moving machinery, environmental factors including temperature and humidity, driving automobile equipment, and exposure to dust fumes and gases (Docket No. 12, p. 541 of 764).

Following Plaintiff's cervical spine procedure in May 2009, Dr. Mineo described Plaintiff as healing very well (Docket No. 12, p. 259 of 764). Dr. Mineo's treatment notes from June 30, 2009 also indicate that Plaintiff was recovering well from her cervical spine procedure, but had a limited range of motion to her neck (Docket No.

12, p. 259 of 764).  Approximately three months later in September 2009, Dr. Mineo observed that Plaintiff had better range of motion in her cervical spine (Docket No. 12, p. 260 of 764).  From September 2009 through August 2010, Dr. Mineo treated Plaintiff for URI, anxiety, a benign adenoma, PLMD, phlebitis, and bowel obstruction, but provided no indication that Plaintiff's cervical issues had deteriorated or restricted her from normal activities (Docket No. 12, pp. 261-262; 646-648 of 764).  On October 14, 2010, Plaintiff was evaluated by Dr. Mineo for back pain after falling from her bed and he referred Plaintiff to Dr. Brower for a follow-up (Docket No. 12, p. 648 of 764).  On October 28, 2010, Dr. Brower evaluated Plaintiff and concluded that the spinous process fracture she suffered was nothing to be concerned about at that point (Docket No. 12, pp. 576-578 of 764). In November 2010, Dr. Meneo evaluated Plaintiff and noted that she had some mild cervical adenopathy, and right arm pain which was treated with medication and a lidocaine injection (Docket No. 12, p. 649 of 764).  Any lingering issues were evidently resolved by August 2010 when Plaintiff underwent her consultative physical examination.  Dr. Amanambu determined that Plaintiff had normal strength and range of motion, was capable of lifting 20 pounds, standing for six hours during a normal workday, and able to walk, bend, twist, crawl, carry and reach (Docket No. 12, pp. 363-369 of 764). During examinations with Dr. Mineo in August 2011, Plaintiff complained of right shoulder pain after doing yard work which was treated with an injection (Docket No. 12, pp. 654-655 of 764). Three days later, Plaintiff returned to Dr. Mineo, but this time complained of left shoulder pain after lifting a grandchild, which was also treated with an injection (Docket No. 12, pp. 656-657 of 764).  In September 2011, Dr. Brower evaluated Plaintiff who complained of numbness, pain, and weakness after riding on the back of a motorcycle while holding on to a helmet that did not fit properly, but Dr. Brower concluded that overall Plaintiff was doing fine (Docket No. 12, p. 579 of 764).

Clearly, Plaintiff's medical records subsequent to her cervical procedure in May 2009 do not support the level of restrictions offered in the RFC assessment signed by Dr. Mineo.  Moreover, Plaintiff's activities of daily living are also inconsistent with the restrictions.  Plaintiff gave testimony concerning her activities of daily living

33

noting that she meets with friends, attends college classes twice a week, performs some household chores, maintains her basic hygiene, eats in restaurants, grocery shops, goes to the movies, surfs the internet, and drives a car five days a week (Docket No. 12, pp. 45-52 of 764).  Plaintiff also testified about traveling by airplane to Phoenix, Arizona in 2009, Hawaii in 2010, and most recently to Las Vegas, Nevada (Docket No. 12, p. 53 of 764).  Given the evidence in this case, ALJ King's decision to discount Dr. Mineo's RFC assessment is supported by substantial evidence.  The ALJ's summation of the medical records, Plaintiff's activities of daily living, and the ALJ's observations that Plaintiff's condition had improved after her May 2009 procedure constitute "good reasons" for discounting Dr. Mineo's signed RFC assessment (Docket No. 12, pp. 24-29; 30-31 of 764).

For these reasons, the undersigned Magistrate finds that the ALJ's decision to afford Dr. Mineo's opinion little weight is supported by substantial evidence.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate recommends this Court affirm the Commissioner's decision.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   October 17, 2014

## VII. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed. Pursuant to Local Rule 72.3(b), any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.  Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals. In *Thomas v. Arn*, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.